## McCLESKEY et al. v. McCLESKEY.
### (No. 11557.)

(Court of Civil Appeals of Texas. Fort Worth. May 1, 1926. Rehearing Denied June 19, 1926.)

1. **Evidence** ⬤⟳151(2)—In suit to set aside property settlement made a few days after husband's death, widow's testimony of finding husband dead in bed and effect on her of realization of his death held admissible (Vernon's Ann. Civ. St. 1914, art. 2462; Rev. St. 1925, art. 2571; Const. art. 16, § 52).

Widow, in suit to set aside property settlement with stepchildren, which was made several days after husband's death, and for allowance under laws of descent and distribution (Vernon's Ann. Civ. St. 1914, art. 2462; Rev. St. 1925, art. 2571; Const. art. 16, § 52), may testify how she found husband dead in bed and effect on her of realization of his death, as tending to show competency to make settlement.

2. **Evidence** ⬤⟳474(4)—In widow's suit to set aside settlement with stepchildren, made several days after husband's death, testimony as to her mental capacity to make settlement, given by witness who saw her on day of husband's death but not afterward, held inadmissible.

In widow's suit to set aside property settlement with stepchildren, made several days after husband's death, testimony as to her mental capacity to make settlement, given by witness who testified that she saw plaintiff immediately after and on day of husband's death, but who did not see her afterward, *held* inadmissible, though same character of testimony was admit-

ted without objection from another witness who was doctor.

### 3. Descent and distribution ⚖➜83.

In widow's suit to set aside property settlement with stepchildren, her testimony as to controversy with one of defendants which arose after settlement and was not connected with it in any way *held* inadmissible.

### 4. Trial ⚖➜350(4)—In widow's suit to set aside settlement with stepchildren, issue as to whether she knowingly allowed defendants to alter financial condition for worse in making such settlement held properly refused.

In widow's suit to set aside settlement with stepchildren, issue as to whether she knowingly allowed defendants to alter financial condition for worse in making such settlement *held* properly refused, since it did not show by what acts financial condition of defendants was claimed to be altered.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Suit by Mrs. E. A. McCleskey against Sam McCleskey and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

See, also, 277 S. W. 1115.

Fitzgerald & Hatchitt and Edgar Scurry, all of Wichita Falls, for appellants.

Bullington, Boone, Humphrey & King, of Wichita Falls, for appellee.

BUCK, J. On the morning of February 12, 1925, E. A. McCleskey was found by his wife dead in his bed, at Iowa Park. He was buried the next day. He died intestate. Mrs. McCleskey was his second wife, married in 1919. Mr. McCleskey had four grown children by his first wife, to wit, Sam McCleskey, Henry McCleskey, Mrs. W. H. Friedberg, and Mrs. Addie Zink. At the time of his second marriage, Mr. McCleskey owned a 388-acre farm, claimed by his widow to be the homestead, situated near Iowa Park, Wichita county, a house and some vacant lots in Iowa Park, a house and lot in Wichita Falls, 649 acres of grazing land in Gray county, some bank stock, and other personal property.

On Saturday after the death of their father, Sam and Henry McCleskey called on their stepmother and talked about a settlement of interests in the estate of their father. Mrs. McCleskey testified that she told them that she did not want to talk about business matters, that she was sick, nervous and worried, but that they wanted the question settled before they went home. The two McCleskey brothers deny this testimony of their stepmother and testified that she did not make any statement of the kind. The children employed John C. Murphree, a lawyer at Iowa Park, to represent them. The parties agreed for each one to appoint an appraiser and the third appraiser to be appointed by the two selected. Mrs. McCleskey appointed J. A. Tanner, and the children appointed R. L. Eads, and these two appointed G. T. Smith as the third appraiser. During the negotiations the lawyer of the children, John C. Murphree, suggested that Mrs. McCleskey see a lawyer. She went to Wichita Falls and saw R. O. Kenley, a reputable practicing attorney, who advised her that in his judgment it would be better to settle the matter out of court if it could be done fairly, and stated to her if she could get the house and lot in Wichita Falls he thought it would be a good settlement. She went back to Iowa Park and talked the matter over with her two stepsons and their lawyer, and they finally agreed on a settlement.

The estate was valued by the appraisers at $41,338.17, with an indebtedness of $2,948.88. By the terms of the agreement, Mrs. McCleskep received lots 15 and 16, block 5, town of Iowa Park, and the improvements thereon, one Overland coupé, one cow and all chickens, all household furniture and goods, utensils, etc., and $2,000 in cash. Mrs. McCleskey claims that the cow was given to her when a calf, and the Overland coupé was given her by her husband during his lifetime, and that they were separate property. They all signed a partition deed, in which the title to the house and lot and personal property mentioned were vested in Mrs. McCleskey, the other property being vested in the four children jointly. This was done on February 20, 1925, eight days after the death of E. A. McCleskey. The evidence shows that the $2,000 paid Mrs. McCleskey was borrowed by the children, and that they paid some debts owing by the estate.

Mrs. McCleskey testified that after the deed had been signed she began to think of the settlement she had made; that at the time of the settlement she was nervous and grieved and did not realize what she had done; that she did not realize the value of the property she had surrendered, nor the value of the property that had been deeded to her. She further testified:

"I did not go to them after I realized what I had done and tell them that I did not want to go through with it; nor did I tell them that I was going to file suit. No; but I will tell you this: First time I thought anything so much was when Sam come down and told me that the deposit on the water and light meter would come to them, and he wanted to cut them off so they could have the deposit. I told him he could cut the water off; I could get along without it; one of the boys had come home, and he could draw the water for the chickens; that I could get along very well without that, but that I would have to have the lights, and it was not long until he sent a man to cut off the lights, and I told them not to cut it off. Mr. Mac made the deposit, and I felt like it ought to be kept up as long as I stayed there on the place, and I begun to get my mind clearer and begun to see how the settlement had gone, what it had done to me, that they could come and do that away. I was not mad about him coming out there for the deposits, but I just

felt like they ought to stay up as long as I was there, so I begun to realize what the settlement had done for me, and I come in and consulted with a lawyer."

The evidence also shows that Sam McCleskey wanted her to pay him, for the children, $57 that was owing to Mr. McCleskey by the tax collector. She had collected this amount after her husband's death, and Sam McCleskey claimed it on behalf of the children.

Some time later Mrs. McCleskey filed a suit to set aside the settlement agreed upon and evidenced by the deed. She alleged that after the death of her husband the defendants, and especially Sam McCleskey, importuned her to surrender her interest in said estate, and began making divers propositions to her, seeking to take advantage of her and to defraud her out of the interest to which she would have been entitled under the laws of descent and distribution, knowing her mental condition was such that she could be easily persuaded to do things which, if she had been in her right mind and good health, and had not been burdened with the shock and grief of losing her husband, she would not otherwise have done; that at this time plaintiff was wholly ignorant of the extent or value of the estate of her husband or of the amount which she would inherit under the laws of descent and distribution, and wholly incapacitated to transact business; that said defendants proposed to her at said time that they would pay her $2,000 for her interest in said estate and convey to her a small house and lot in Iowa Park, of the reasonable value of about $1,500. She further alleged that the defendants falsely and fraudulently represented to her that the amount offered by them to her was largely in excess of the value of her inheritable interest, and that plaintiff by reason of her ignorance of such values, and by reason of said false representations and statements, was induced to execute some kind of an assignment or conveyance, the exact nature or character of which was to the plaintiff unknown, conveying to defendants her entire interest in the estate of her deceased husband, in consideration of the $2,000 cash paid and the house and lot in Iowa Park. She alleged that said purported settlement was unfair and inequitable, in that her inheritable interest in the estate of her deceased husband was worth many times the amount she received from said defendants, and that her inheritable interest, she is informed and believes, is in excess of the value of $15,000. Wherefore, she prayed that the court hold said settlement void, and she tendered into court the $2,000 paid, and the deed to all the property she received in settlement of her inheritable interest.

The defendants filed their answer, consisting of a general demurrer and a general denial, and specially pleaded that the plaintiff was in possession of her right mind and faculties at the time she entered into said contract, and that said contract was her own proposition, made to the defendants and by the defendants accepted. They further pleaded, in the way of estoppel, that the defendants had been forced to change their position to their disadvantage in order to borrow money to pay Mrs. McCleskey the $2,000, and to pay the debts owing by the community estate; that she allowed these things to be done and accomplished without giving any notice of her intention to repudiate her settlement and contract.

The cause was tried before a jury on one special issue, to wit:

"Did the plaintiff, Mrs. E. A. McCleskey, at the time she executed the partition deed in evidence before you, have sufficient mental capacity to understand the nature and subject of such partition and the consequences of her act in signing the same?"

To which the jury answered: "No."

The court further instructed the jury that the burden of proof was on the plaintiff to show the negative of the special issue submitted by a preponderance of the evidence, and, if she failed to do so, the answer would be, "Yes." Upon this finding of the jury the court rendered judgment, declaring said partition deed and the agreement preceding it null and void, and further decreeing to plaintiff an estate for life in the homestead of her deceased husband, so long as she might use, occupy, and enjoy the same as a home, and further awarding to plaintiff the interest in her husband's estate which she had under the laws of descent and distribution. From this judgment the defendants have appealed.

### Opinion.

Under the laws of descent and distribution, Mrs. McCleskey would have been entitled to one-third of the personal property, and an estate for life in one-third of the land left by her husband, dying intestate, including a life estate in the homestead and a right to occupy the homestead so long as she should elect to use it. See article 2571, Rev. Civ. Statutes 1925, and article 2462, Vernon's Civ. Statutes 1914; article 16, § 52, state Constitution. Mrs. McCleskey testified that during the years of her married life from 1919, the farm and homestead had not produced enough revenue to pay the taxes. But whether or not the contract made by the plaintiff and the defendants and set aside by the trial court's judgment was more or less advantageous to the widow than her rights under the law we will not concern ourselves.

[1] On the trial of the case appellee was permitted to testify in detail how she found her husband dead in bed, and how she felt his cold body and realized that he was dead, and the effect that such realization had on her, and how she fell to the floor, etc. The defendants objected to this testimony as being wholly irrelevant and highly inflammatory and prejudicial, in that the jury would be-

come biased in plaintiff's behalf by reason thereof. The court overruled the objection. Appellee urges that said testimony was admissible in order to show the nervous condition she was in at the time of the discussion of the details of the partition settlement and of the execution of the partition deed. It will be remembered that the partition deed was executed eight days after the death of Mr. McCleskey. At least a majority of the court do not believe that such testimony becomes inadmissible by reason of being too remote, and hold that it tended to shed light on the question as to her competency at the time of the execution of the partition deed to understand its nature and effect. The assignment is overruled.

[2] On the trial of the cause Mrs. Curtis Hill, a witness for plaintiff, testified that she went to the home of Mrs. McCleskey on the morning of February the 12th, the date of the death of Mr. McCleskey, and immediately after he was found dead, and found Mrs. McCleskey in a condition of excitement and grief. Mrs. Hill was then asked by counsel for plaintiff the following question:

"State whether or not in your judgment she had sufficient mental capacity immediately after the death of her husband, or a few days thereafter, to understand the nature of the contract she was making or not; understand the effect of the contract; a contract—understand the nature of the contract she was making involving some—according to the appraisers, some $35,000 or $40,000 worth of property; now, you testified that you had seen and observed Mrs. McCleskey's condition just before and after her husband's death, based now on what observation you had, your conversations with her, her actions, and all of those things, as well as her physical condition, state whether or not in your judgment she had sufficient mental capacity immediately after the death of her husband or a few days thereafter to understand the nature of the contract she was making or the effect of it."

The witness answered:

"I don't think she was capable of making the contract."

To this question and answer defendants objected, first, because it called for the conclusion and opinion of the witness, and the witness was not shown to be qualified to answer that character of question; and, second, the testimony of the witness shows that she never saw Mrs. McCleskey after that morning until after she had executed the contract, on the 20th of February, and for said reason she could not state the condition of plaintiff's mind at the time she executed the contract, and to base it on her condition on the 12th, under the circumstances as detailed by the witness, would be a remote and vague conclusion that the witness was not shown to be qualified to give. The court overruled said objection and allowed the witness to answer as above set forth. Perhaps a stronger ground

for objecting to the admission of this testimony is that it called for an answer on the very question which the jury was to decide. But that objection is not specifically raised. However, we are of the opinion that the assignment should be sustained. Appellee urges that the same character of testimony was admitted without objection from Dr. Clark, and that therefore the assignment should be overruled. The motion for new trial shows that the defendants did urge as grounds for a new trial that the testimony of both Mrs. Hill and Dr. Clark were improperly admitted. Dr. Clark testified as to the nervous condition of Mrs. McCleskey on the morning after her husband's death, and that in his opinion she did not have sufficient mental condition to transact business, such as the partition of the estate, two or three days or even a week after his death. There is no assignment in appellants' brief, nor any bill of exception in the record, preserving this point. But we think the questions raised in regard to the admission of the testimony from the two witnesses are a little different, inasmuch as Dr. Clark was a physician and testified as an expert. Moreover, we do not believe that it was necessary to present two assignments in order to raise the question of error in the admission of the testimony of Mrs. Hill.

In the case of Brown v. Mitchell, 88 Tex. 350, 31 S. W. 621, 36 L. R. A. 64, the Supreme Court had a case appealed from this court, in which a witness was asked the question:

"From what you saw and observed of Mrs. Lizzie Brown, deceased, her talk and actions, and her mental and physical condition during the last ten or twelve days of her illness, and at the time of the execution of the said instrument of writing, do you think that she had sufficient mental capacity to declare her last will and testament, and dispose of her property?" "Answer: I do not think she was capable of making her will. All day she had been out of her head, talking about dead babies, and asking if they were putting them on ice, and if the hearse had come. We dressed her before she signed the will. She was very weak, and we had to lift her up."

The Supreme Court, in an exhaustive opinion by Judge Brown, discussed the question involved and cited many cases of this country and England, and concluded with these words:

"We think that the authorities cited, upon established and sound principles of law, will maintain the conclusion as correct, that no witness will be permitted to testify to a legal conclusion from facts given either by himself or testified to by another. It is the province of the jury, from the testimony, to find the facts; but it is the duty of the court alone to inform the jury as to the rule of law by which they are to be governed in determining upon the sufficiency of the facts given to them by the witnesses. The conclusions or opinions to which witnesses may testify in this character of cases are simply to be treated as facts presented to the jury by means of the conclusions drawn by the witness-

es from their observations, for the reason alone that the facts are of such character that they are incapable of being presented, except by stating conclusions drawn from observation.

"It is due to the Court of Civil Appeals to state, that in this case the judgment of the court below was first reversed by that court upon the ground of error in admitting this testimony, and Judge Stephens in his opinion [29 S. W. 927] clearly stated the legal objection to this character of evidence. But upon a motion for rehearing, in accordance with the opinion of this court upon certified questions, the Court of Civil Appeals affirmed the judgment from which this writ of error is sued out, and which judgment we now reverse. Although the certified question from the Court of Civil Appeals to this court stated that a copy of the opinion of that court accompanied the question, the opinion, in fact, was not before this court; neither was there a copy of the brief of counsel for either party.

"We believe, that in so far as the former decisions of this court may be understood as holding that this testimony was competent and admissible, over the objection that it expressed a legal conclusion, they are not supported by sound authority, nor sustained by correct legal principles, and we are constrained to overrule those cases, in so far as they be so understood."

In Williams v. Livingston, 52 Tex. Civ. App. 275, 113 S. W. 786, the San Antonio Court of Civil Appeals, in an opinion by Justice Neill, held that it was improper to allow an expert witness to give an opinion as to whether a decedent had mind enough to comprehend the legal effect of a deed, the opinion being in part on a question of fact, as to the competency, which was for the jury, and in part as to the legal effect of a deed, which was a question of law for the court; that a witness should not be permitted to give an opinion, which, if the jury believes it to be correct, would determine the matters of law as well as the facts involved; that a witness could not give an opinion that decedent did not have sufficient mind to execute a deed or to not know its effect or value, though witness was familiarly acquainted with her, and had testified from his observation of her conduct that she was very weak-minded. In this opinion the court cites a number of cases, including 2 Wigmore on Evidence, § 1958, and Metropolitan Ins. Co. v. Wagner, 50 Tex. Civ. App. 233, 109 S. W. 1123, and Brown v. Mitchell, supra. We sustain the assignment, believing that the evidence is inadmissible. See Jones' Blue Book on Evidence, vol. 2, p. 866.

[3] During the trial, and while Mrs. McCleskey was testifying, the court allowed the appellee to testify about a controversy she had with Sam McCleskey, one of the appellants, over $57 that was owing to E. A. McCleskey at the time of his death by the tax collector of Wichita county. This controversy arose some days after the execution of the deed, and was in nowise connected with the

matters and things urged by appellee as a reason why the deed should be set aside. Mrs. McCleskey testified that when Sam asked her for the money she said:

"Well, Sam, I did not have anything to live on, and I owed a doctor bill, and I felt like that I ought to have the money, but if you feel like you need part of it I will divide it with you; and he said it all belonged to him."

Defendants objected to this testimony because the same was highly prejudicial and inflammatory and was with reference to matters that arose long subsequent to the settlement and was calculated to prejudice the minds of the jury against the defendants. The court overruled the objection. We are inclined to think that the testimony should have been excluded.

[4] Appellants requested the submission of this issue:

"Did the plaintiff, after she had made said partition deed, knowingly allow the defendants to alter their financial condition for the worse? Answer 'Yes,' or 'No.'"

It is urged in appellants' brief that the issue should have been submitted. We do not think that the issue as shown in the record should have been submitted to the jury, since it does not show by what acts the financial condition of appellants were claimed to be altered.

We do not find it necessary to pass specifically on the other assignments presented, though we have considered them carefully, and think that we have sufficiently passed upon all questions which will likely arise in another trial.

The judgment of the trial court is reversed, and the cause is remanded for another trial, not inconsistent with this opinion.